Okay, this is the case of 514-0178 in re Marriage of Johnny Gwaltney v. Kia Marie Gwaltney. Mr. Bradley, are you ready to proceed? Yes, Your Honor. May it please the Court and the Council, my name is Joshua Bradley. I represent the appellant and petitioner in the following matter, Johnny Gwaltney. This case comes to you from the Appeals of Johnson County for the divorce 2011-D-72. The date of notice of appeal was filed on April 18, 2014. The date of judgment is February 21, 2014. The facts of this case, would you like me to go through those? Sure. The facts of this case are pretty straightforward as it relates to the child. Okay, so rather than go through those in great detail, I'd like to give you a synopsis of what they are. The facts of this case is that these parties of marriage have a wonderful child. Hayley. Hayley has been doing well in school. Hayley has been doing well in all things. Hayley is an excellent athlete and an excellent student. Are you talking about now or before or both? Before this and during the time that my client had custody of the child. And how about now? And now, I assume she's doing, still doing well also. She's an exceptional child. I'm talking about my client. And before we got here today, she's doing well, plays ball, softball, and is an excellent athlete. As it pertains to this case, this case was filed back in December. On February 24, 2012, an order was entered, an agreed order, providing for basically custody for my client, Mr. Walton. That case then proceeded through litigation and finally went to trial. In which case, custody was changed to the client. The property in this issue is basically very simple as it relates to... Before we get to property, what was the basis for the order of protection? Where did that come about? The basis for protection was filed by my client. And the basis of it was certain actions which Ms. Walton had undertaken during the course of his proceeding. He filed that on an emergency case court basis. It was granted by the court. It was set for plenary order of protection. And at that time, Ms. Walton had counsel, that being Ms. Tammy Jackson. At that time, the order of protection was dismissed in that period of time. And the agreed order was entered in the divorce case when the order of protection did not cease to have any bearing on the case at that period of time. Was there a trade-off there? Was there any trade-off? Like, we'll dismiss the OP for agreeing to the temporary order? Well, I mean, any negotiation of an agreed order is always a negotiation as to how things are going to proceed. But the temporary order was actually entered in the dissolution case. In the dissolution case when the order of protection was dismissed, which typically happens in divorce cases. When you have an order of protection filed at the onset, things settle down, people again intend to hire lawyers and have counsel, that period of time, that typically does happen. In most divorce cases, the order of protections tend to go away at that period of time and tend to not maybe go to fruition. But that was her choice at that period of time, Ms. Walton's. She could have chosen to challenge the OP at that case. There were also motions for temporary relief while asking for custody at that period of time and visitation of child support. Those could have been heard or said for hearing. They were not. Those things were not ever heard during that period of time. Which leads me into the custody arrangement of the parties. My client is a correctional officer with the Department of Corrections. He, at that point, based upon the order, had, basically, they were going to try to work out a pestity. However, that, if it didn't, it reverted back to what was in the order of protection, which was basically a standard schedule, which they operated under for basically two years from the time that this case started until the time that it ended. Now, under the cases of Wyckoff and Heffner, which are 266 Illinois Appellate, 3rd, 408, and 282 Illinois Appellate, 3rd, 73, those cases have described situations exactly what we're facing here. You have a client, Ms. Walton, who agreed to an order for visitation, basically gave my client custody of the minor child. You have a long, extended period of basically temporary custody with the minor child. The Wyckoff and Heffner cases basically conclude that, in that situation, things kind of reversed. You have a child who's doing well, which was doing well under the custody of Mr. Walton. Was attending school regularly. Had no problem with grades. Grades maintained. Playing softball. Active in activities. Active in band. Active in sports. Basically doing well in all of the activities which he was supposed to be in and doing well. Then this doesn't actually – you have to look at that factor as a means of stability. In our opinion, in the present case, the trial court ignored that factor. They relied more on the fact that, well, yeah, I've heard the allegations in the O.P. Well, that is gone at this point. If you look at the factors which happened since the time the agreed order was entered, which both parties had the right to reject and conform with until present, there is nothing to show that Mr. Walton did anything inappropriate. What the trial court seemed to place their most emphasis on in their ruling of February 21, 2014, was two issues. Number one was communication between my client and Ms. Walton. And the other was the fact that he didn't allow for some babysitting time during the morning hours before he went to work. I'd like to address those two issues very specifically. When it comes to the communication issue, the two controlling cases which have been done, Ricketts and Spent, 329 Illinois Appeal at 3rd and 173, and Spent, 342 Illinois Appeal at 620, those cases both describe what kind of behaviors and what kind of things need to go in to a situation like this. There needs to be some communication. Now, one of the things that I requested and the court granted in this case was the voicemail messages which were sent by Ms. Walton to Mr. Walton during the present case. The messages in and of themselves are yelling, screaming, hollering, lack of communication. Some of them are pick up the phone. Some of them pick up the phone. And the trial judge said, you know, your client was not communicating. And I think part of that goes to the fact, Your Honor, that that's a good question. But when you have somebody who's willing to place a message like that on a answering machine, if Mr. Walton's position, and I think the case law is clear, that when you have a situation where one client is volatile in behaving in this matter, do you have to pick up the phone and try to take that verbal abuse from them or deal with it? Well, the trial court heard the evidence on both sides. Yes. Okay, and listened to the tapes of those messages and came away saying the problem here is that Mr. Gwaltney was not communicating, which led Mrs. Gwaltney to leave messages where she would yell, pick up the phone or whatever. Okay? Why is that against the manifest way of the evidence? Why that's against the manifest way of the evidence comes exactly from Mr. Gwaltney's testimony, which is contained in the record on C-400. It's in my brief. He's questioned about this exact issue by me and then again by Mr. Dierkoff. Do you feel at this point you can communicate with Mrs. Gwaltney and bring her child to Haley? He answers. As long as it's a civil conversation. There was plenty of testimony about him trying to pick up the phone, her calling. There was testimony about him stopping her in public places. There was testimony about her trying to work her way into the house, trying to take answers when she's out on the phone. All of these types of things, which leads someone in a reasonable circumstance to a pretty significant shot to avoid those confrontational issues with a parent who is being hostile at all times. So that's why it goes in the manifest way of the evidence. You know, do you keep her informed of events at school and things of that nature, which is one of his big issues? If I wrote my daughter notes, we're not talking about a 4-year-old child. We're talking about a 9-year-old child. I don't see any problem or difficulty if a child says, hey, I've got a big play next week. What am I going to tell your mom about that? If she doesn't tell her, then he does. The next thing is when he was cross-examination, the court relied on do you relay messages through Haley? His exact response to that was she likes to tell her mother. Like I said, if I don't tell her and Haley wants to tell her, I let Haley tell her. And typically we don't try to communicate messages through parents and everything else. We try to have communication. But if a kid wants to tell somebody about what's going on and how they want to, what's going on in their lives, and we have a child who is very bright and we have a child who wants to tell them, there shouldn't be a problem with that as long as there is some communication there in regard to that situation. So I don't feel the communication issue that the trial court relied upon based upon the tapes and based upon the conversations. And one of the clear episodes that I find is most troubling in this is found in the record, found in my brief, is when there's a conversation between he and him and his wife in front of both children, not only his other son and his daughter where she basically uses foul language and tells his son about him. You know, he shouldn't even be here and he might have been aborted. These are things which are not, should be said in front of any child, whether it be an 18-year-old child or a 9-year-old child or any child. Is that an uncontroverted fact? As far as I am aware from the record, that was not controverted in the testimony under cross-examination or under the case from the other side. You know, these are things which are said during the present case. And this is the kind of conversations he's been making with Connie, which leads me into the second part of the custody issue which the court said relied upon was the babysitting. It's not just the court made a finding that your client had demonstrated an unwillingness to cooperate in such a manner as to, you know, promote a relationship between the mother and the child. Yes. You know, I mean, so it wasn't just the babysitting, was it? I mean, based on all the testimony as a whole, including, I think, you know, probably some of what you're characterizing as communication was not himself making her aware of school activities or whatever. I mean, that was all lumped in together with the trial court, wasn't it? It was all lumped in together. Really, my babysitter said, we're not communicating, you're not babysitting. In my position, as we look at the totality of the evidence from that, my client is saying, yes, I am communicating with her. She's civil to me. I think the case law says if you're not civil, you know, from written expense, you know, you try to avoid the confrontations whenever possible. And the second thing is, you know, you try to say, well, you're relaying a message to the kid. Yeah, maybe I'm letting the child at 9 years old tell this individual that, hey, you know, I want to tell mom about my game thing this weekend. Okay, go ahead and tell her when you get there to do that. But what we have here, more importantly, is we have a child that for two years had no issues, no problems, did well in the care of my client. You know, those factors and the stability factors, which, of course, is paramount in any case, tends to outweigh that, but at the same time, the communication factors which the court saw as it related to these issues basically tend to spring out of my reading of the evidence and the best way out of the behavior of Ms. Walton, out of the behavior of Mr. Walton. Trying to avoid confrontations in custody and civil disputes is what we try to strive for as individuals, especially in front of the children. It appears in the testimony that she's trying to engage in this type of conduct. The babysitting provision, you know, which I understand is part of the law now, kind of goes along with this. I mean, you know, the only time that she was really utilizing a babysitter was in the mornings from like 630 to 7 before they came into school. So what was the schedule? I mean, wasn't the child take it when he would leave for work, he would take the child somewhere where the child would then go back to bed for a period of time. So the child has to be awakened, moved to a different location. The child goes back to bed, and then somebody gets the child up and takes the child to school. Or the child is already awake and she's in early arisal with her dad, and they make arrangements for that, and then the child is taken to school at between 730 and 8 in the morning. And during this time, the mother had, as I understand the record, repeatedly said, I'll come over. She didn't have to be woke up and moved. I'll come over and take care of her until time for school. Mr. Waltney would not agree to that. I mean, and the trial court didn't like that. The trial court didn't like that, but under the circumstances, it's perfectly reasonable because you're talking about an hour's worth of time. And the other factors that play into that are the fact that she was not living in the same town. You know, they had problems in the past with volatility of the home. You know, they had problems with issues you could tell from the voice or messages from the testimony. These weren't two people that were getting along, you know, during the course of the marriage. These were two people that were arguing, or at least we would put our opinion, Mr. Waltney was arguing with Mr. Waltney constantly about all of this. His position or rationale is to say, hey, listen, I'm just going to take your babysitter for an hour in the morning instead of making her drive an hour and a half, hour and a half, an hour's worth of time with the individual. You know, yes, if it were okay, I'm going to be gone. But one of the things I think is clear on this, Judge, is in the summer months, when, you know, our babysitting was having to be done, Mr. Waltney agreed that the child spent the majority of the time with her during the summer months. That's not someone who's willing to cooperate or not communicate with the other side. What he's saying is, okay, you know, yeah, I've got to work during the summer months. The other side is not working that much. So, you know, what he's trying to paint the picture is, well, he's not communicating. He's not working with her. But yet we have this whole summer issue where he can go ahead and agree and say, yeah, I've got to work during the day. Go ahead and keep her during the day while I am at work. Those two factors tend to contradict one another. You know, you're trying to say, well, you didn't allow us an hour in the morning during the school year. But during the whole summer months, then, you know, the time is available in there. If he doesn't allow that and they do agree to that, you know, that tends to express the communicative issue. And instead of Ms. Waltney doing the right thing in that person's case by saying, hey, I have a schedule. I have to work. Let's do it. Let's get this done in the same way. Based upon that and the factors that are happening in Wycombe, we have a situation where the kid was doing well in the home, in the marital home at the present time, doing well where she was doing, doing well in school, and basically the trial court put that on its head on two issues, which we feel the evidence shows based on, as a change of matter, that's what evidence, that the communication was there. It was attempted by Mr. Waltney until things became irate. That they were able to work out issues that the babysitting time that the court was so concerned about happened, you know, for such a brief period of time in the morning. We're not talking about four hours in the morning or 15 hours in the morning. If Mrs. Waltney wasn't even living in the same county, she was living in a bridgeway almost 50 miles away from where this was presiding at. You know, you're talking about a 50-mile drive both ways in order to do that. Are you saying 50 or 15? I think about 50. 50, yeah. Thank you, Mr. Bradley. You'll have time for a follow-up. Thank you. Is it Mr. Deerhoff? Deerhoff, yes, Your Honor. Okay, Mr. Deerhoff, you may proceed. Your Honor, I just want to please the court, opposing counsel, good morning. My name is Attorney Dennis E. Deerhoff. I represent Kimberly Waltney, the respondent to the Pelley. The defendant, as we referenced her in our brief. And we're here about a case where the trial court made the correct decision under all the circumstances. These cases fall within a realm of reasonableness under all the factors and under all the circumstances. This case is one of those cases that falls within a reasonable decision made by the trial court after hearing of all the facts and circumstances. Mr. Deerhoff, I want to ask you a question. What was this exchange? Why did this exchange of the child happen in a neutral place? Your Honor, I was not trial counsel at the time that the temporary agreement was made. And so I really, I suspect that it was so there would be other people around. I really don't have a great answer for that. I don't know. Well, a lot has been made about the fact that the mother wanted to come to the house and babysit for however many minutes or half hour. And yet it seemed like the normal exchange of the child occurred outside the home. Is that true? I believe that it did occur at a different location. I believe that it was at a convenience store. I guess I would also further answer by saying that Mr. Bradley correctly stated there was an order of protection that was dismissed as part of a temporary agreement in the divorce case. And when that happened, there was language that we'll try to work out more time. But what it quickly became was this is the time you're going to get because this is what the order says. And as I understand, what happened was the judge entered an order of joint custody, right? Ultimately. Ultimately, the court in the court's ruling, I believe he reserved custody being either sole or joint and instructed the attorneys and the parties to come up with some sort of joint parenting agreement. But when that did not happen, then I believe the judge then found the sole custody. So the way the brief was written, it said the trial court initially awarded joint custody with your client as primary physical custodian. And then the very next day amended its order without anybody present, no hearing, and gave respondents sole custody. Is that true or not true? I don't believe that's accurate. Tell me what's accurate. We went back to court. We got back in front of the judge, told the judge, Your Honor, we can't come up with an agreement. This is the way I recall this happening. Your Honor, we haven't been able to make an agreement. The opposing counsel has not called me back. They haven't talked to me. We don't think an agreement's going to be able to be made. And then at that point, that's when I believe the judge instructed that there would be sole custody with visitation to Mr. Wolfe. That's the way I recall it. And so within the space of a couple of weeks, we go from two years of joint custody with the child living in the marital home with her dad, and then everything is reversed. Is that what happened? No, Your Honor. Everything is not reversed, Your Honor. The child, and Mr. Bradley argued a lot about the child's environment and stability, but, Your Honor, the child stayed in the home. My client was awarded the marital home. And it was clear between the parties and the judge, trial court judge, that whoever got the child was going to also maintain and keep the home and have the home as well, because the court was concerned about pulling the child out of the home, pulling the child out of her school, pulling the child away from extracurricular activities. So the parent that was in the home changed, Your Honor, yes. But the minor child was not dragged out of her home, taken to another town, taken someplace else to a different school. Most, the only thing that changed, Your Honor, was the parent that was in the home with the child and who was the visiting parent. So it wasn't like it was a total tearing the child out of her environment. I would also say that, in answering that, that under the stability, the Wyckoff and Ricketts are two cases, I'm sorry, Wyckoff and Herford are two cases that Mr. Bradley relies heavily on. And in Herford, the court noted, however, that the mother was the sole custodian of the children during the four years when a temporary custody order was in effect, during some of the two previous years and after parties initially separated. Okay. These cases, there is nothing, there's nothing in the statute, there's nothing in case law that gives a preference or a statutory preference or a clearly defined preference anywhere for who has the child longer during the temporary part of the divorce. You have to look at who was the primary caretaker of the child during the marriage, during the child's years when the child was being brought up. Who was that caretaker? You have to look at that also. Here we've got a situation where my client was the primary caretaker. She did not have full-time employment. The record reflects that her annual income was about $12,000 maybe as opposed to $62,000. You have a situation where Mr. Gwaltney had the primary bread-winning job in the family. Not until the divorce got filed did Mr. Gwaltney even come off of midnights at his work. So then you have disorder protection that gets filed. Parties are going to have problems in divorces sometimes. And the trial court judge recognized that. And he considered that. The trial court judge listened to all of the tapes. He considered all of the evidence. And he made his decision based on a consideration of all that. So to say that this is the result of abuse of discretion is simply incorrect. It's not abuse of discretion. Was there a joint custody order at that time? A joint one? Let me ask a question about that if I can. The judge wrote a letter. He decided the case by letter ruling. Yes. And said joint custody parties produce a joint parenting agreement. Then you prepared like a month later, you sent him a proposed judgment of dissolution of marriage, setting out what he had in the letter. And he hand wrote at the end of that, the matter shall be set for status to resolve whether it's going to be joint custody or whether it will be sole custody. That was what was in the written judgment of dissolution of marriage. But that also follows the statute on joint custody, which says that if a judge can consider joint custody and he must first request a joint parenting agreement, but if one is not produced, he can award sole custody. That's what the statute says, right? And that's what he did. That's what happened. So there was not a joint custody order? There was not an order from the court saying this is the joint parenting agreement, this is the joint custody order. It was reserved and we were ordered to try to come up with one. Okay, so this is where I'm confused. The temporary order that was in effect for two years was a joint custody order. You don't know? I don't know, Your Honor. Okay, so the letter agreement, though, you submitted a joint custody parenting agreement, didn't you? The letter, it was a letter. In response to the letter. In response to the letter, I don't believe I did. And the reason that it took so long to get the proposed judgment back is because I was making efforts at the time to try to come up with a joint parenting agreement, but it just wasn't going to happen. So did you communicate that to the court? Yes. That you could not come up with a joint parenting agreement? Yes. Thank you. Mr. Gwaltney has relied heavily on both Ricketts and Spence, Your Honor. Both of these cases are modification cases. And in his brief, he argues that this case should also be treated like a modification. There should be a higher standard of proof applied to this type of situation because Mr. Gwaltney got custody of the child temporarily and the divorce case took a long time to be resolved. There's simply nothing in the statute or in case law that says that there is any kind of deference given to that. This should definitely not be treated like a modification. Ricketts and Spence, both modification cases, Your Honor. The petitioner relies heavily on these tapes that my client used foul language around the child. Your Honors, however, there are numerous incidences testified to by my client about domestic violence perpetrated upon her by the petitioner. And the court also heard those and had to take those into consideration when making the decision at the lower level. So this is not a situation where my client is this crazy lunatic running around making all these accusations and these terrible messages without being somewhat provoked with a history of violence between the parties. And the judge took these into consideration. When you look at the communication issue, you have to look at the willingness to communicate. A lot of those tapes, of those messages were, pick up the phone, talk to me about our child, and you are not doing that. Granted, granted, there is some colorful language in there. They are not, nobody would be proud to have those heard. But at the time, Your Honors, my argument is, Mr. Gualdi knew how to push Ms. Gualdi's buttons. He knew that if he didn't talk to her, that she would slip up and do something that he could use in court. And that's what we have here. The court, the trial court level, took all the evidence into consideration. Under Quindrey and Felsen, the trial court is in the best position to observe the testimony, evaluate the evidence, consider the child's needs, and the trial judge is in the most capable spot to evaluate the temperaments, personalities of the parties, and the demeanor of the witnesses. So we have an emotionally charged situation like many divorces are. The trial judge observed the parties. He observed the way they acted when they testified. He observed how things went. He took all that into consideration as well. Our situation in our case is distinguishable from Mr. Bradley's cases, additionally, because, as I said before, the child was not removed from the home. The environment did change. The mother became the primary custodial parent with sole custody. Mr. Gualdi left the home. That's what changed. And, Your Honor, you asked Mr. Bradley how the child was doing, and I have information on that. The court like knows she's doing very well. Nothing has changed, I believe, about her grades or her extracurricular activities. So the most important factor here, Your Honors, is the willingness and ability of each parent to facilitate and encourage a close relationship between the child and the other parent. And the trial court judge found that that was not happening. It was being frustrated. It was just a little babysitting time. Well, no. It was the child got up at 5.30 in the morning, went to the sitter or daycare, and then either slept or hung around there and waited to go to school. Then the child got out of school, went back to the daycare, and then went back home. Now, is that in the best interest of the child? I don't know. No, it's not. The child would be sent to babysitters at other times when the mother stood ready, willing, and able to take the child. It didn't happen. What was the mother doing as far as a job that she could drive 50 miles each way? Your Honor, she had a part-time job, and she had to borrow money from family. She had to borrow money? Yes. Because I saw some reference that she came up with $120,000. Your Honor, that's incorrect. The testimony was at trial court that my client somehow had access to this huge amount of money that she had available. This is what happened. At the trial court level, there was a lot of talk about how we were going to get the money out of the house, how the equity was going to be exchanged. So what happened was my client's sister, who owns a welding and equipment company who does service at mines around Southern Illinois, said, if she needs the money right now, today, right now, to do a settlement, to make this happen, I can call the bank, and I will personally loan her the money to make this happen while she's waiting on the financing to come through after the appraisal, after all the paperwork is done. It was not that my client had that amount of money sitting around, Your Honor. It was that she had access to it through family for a loan only that was to be paid back after the home was refinanced. Thank you, Your Honor. Thank you. Mr. Bradley, you have a rebuttal? Yes, I do. Thank you, Your Honor. Judge, answering one of the first questions you asked, why did they exchange the local gas station? Because they couldn't get along. Because going to the house is too much of a problem. Because every time they went to the house, the police would come. Let me ask a question about that. I mean, you're not asserting that it was error for the judge not to award joint custody, are you? I'm not aware of an error that wasn't awarded joint custody. I'm aware that it was an error to award primary custody. I mean, you understand what I'm saying. A lot of the argument has been these parties can't get along. A lot of parties, they can't get along because they can try. You know, they awarded joint custody, and that's what he did. But I would also like to add that I believe, if you look at the record, the motion for joint custody was in her sua sponte without any hearing or anything like that. Sole custody. Sole custody with sua sponte without any hearing on that. So Justice Stewart is asking, did you want joint with primary? Are you wanting us to reverse and say he should have awarded joint custody? Joint custody with primary, my client, yes. My client is one of the workers. He's trying. Wyckoff or Heffner, sorry, Wyckoff decision is exactly what it says. Where there is a lengthy period of temporary custody, the case may be more like a petition to modify custody than like an initial award of custody. That's what the case says. That was their whole. When Mr. Gerakoff, that attorney, said there's nothing in the case law or nothing that says that this is more like a petition to modify, that is. That was a two-and-a-half-year period between the filing of the dissolution and that. We have a two-year period. We're just six months short of that. Second issue, we talked about domestic violence. There's no fighting domestic violence or anything related to the judge's ruling or anything related to that. He also likes to talk about the best interest of the child. Several factors he forgot about. One of the factors, key factors, was the fact that my client had custody at that point of his son, who he basically had removed out of the house at that point also. His what? His mother had died and got back. He removed his son, who was older, from the home along with my client and the daughter. Basically, he disrupted everyone's life in the present case. What you have here is. . . Let me ask a re-asked question. Justice Cates asked Mr. Gerakoff. The temporary order, was it for joint custody? No. Or was it simply custody in your client? Just simply custody. It was kind of endangered to be quite honest with you. Okay. Ms. Jackson was involved in that. Best interest of the child, though, and he wants to keep arguing that, dictates that you don't leave messages like this where the kid can hear it. You're meeting at the Cheers stop down in Miami. You've got messages on the phone. You've got people that can't get along. And yet we totally reversed that in the opposite direction as it relates to the issue of custodial visitation. We totally ignore that factor when it comes in there. You want to say, well, you know, he knows how to push their buttons. He knows how to push everyone's buttons. This is a divorce case. I remember a judge telling me a long time ago, if you can't be on your best behavior during a divorce case, then, you know, something's wrong. You have to be on your best behavior during what's going on during a divorce. And it's clear that Ms. Walling couldn't be on her best behavior from just the mere things that she did during the present case, having a meeting at Cheers. You know, they want to brag about, well, why can't he come home to the house? Well, you can hear the tape messages. You can hear another factor of meeting at the Cheers gas station in order to deceive one another. That all lends to the fact that, you know, the communication issue wasn't on the fact of Johnny's issue. This is on the fact of Ms. Walling and her not being able to communicate rationally in a precise and clear nature. When push came to shove and it came to Summer, though, we had no problems. And that, I think, is the linchpin of this. You know, when it comes to Summer, when she has money in her pocket, Mr. Walling says, yeah, I can't keep her. You go ahead and keep her. And it leads back to the $120,000 issue that you asked about earlier. The question was, was the marital home issue. It was the childhood stay in the marital home. And they were trying to buy her interest out. And on that day in court, it's in the court record, she said, I got a check for $120,000 on that day. That goes to my whole bank decision and attorney's fees, which the court convened to really identify these festivities as the most important. But on that day in court, she was able to come up with $120,000. Never paid one dime of support during this. Never paid one dime of anything to Mr. Walling for the care of this child. And then it gets awarded maintenance, attorney's fees, everything else related to this issue. Your Honors, I feel that based on the manifest weight of evidence, which was heard in this case, that there is no way that the court should have awarded primary custody to Mrs. Walling. This court ought to reverse that decision, give joint custody, give primary custody to Mr. Walling, let him continue, which is going to change a whole different thing when it comes to the marital home and everything else. But the court has a right to do those issues. And the court has a right to change that. That's why they're in there. But, you know, that's really the property. Everything else is basically very straightforward as to what we feel. You know, she didn't work very much. She had access to funds. She never paid any money. She has the ability. We feel this court should reverse the child birth decision. Thank you very much, gentlemen. Thank you, Your Honors. This matter will be taken under advisement and a dispositional issue in due course. Okay, we'll temporarily adjourn until 1.15.